# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

NETLIST, INC.,                          §
                                         §
      *Plaintiff*,                      §
                                         §
v.                                       §   CIVIL ACTION NO. 2:22-CV-00294-JRG
                                         §
MICRON TECHNOLOGY, INC., MICRON          §  
SEMICONDUCTOR PRODUCTS, INC., and        §
MICRON TECHNOLOGY TEXAS, LLC,            §
                                         §
      *Defendants*.                     §


## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Before the Court are two Motions. The first is Plaintiff Netlist, Inc.'s ("Netlist") Motion for Summary Judgment of Micron's Antitrust Counterclaim and Affirmative Defense of Patent Misuse (the "Motion"). (Dkt. No. 344.)[1] In the Motion, Netlist requests that the Court grant summary judgment against Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC's (collectively, "Micron") antitrust counterclaim and affirmative defense of patent misuse. (*See generally*, *id.*) Micron opposes the Motion. (*See* Dkt. No. 427.) For the following reasons, the Court finds that the Motion should be **GRANTED**.

The second motion before the Court is Netlist's Motion to (1) Dismiss Micron Defendants' Counterclaims or in the Alternative Sever and Stay and (2) Strike Micron Defendants' Affirmative Defense of Patent Misuse (the "Motion to Dismiss"). (Dkt. No. 154.) For the following reasons,

---

[1] All Docket cites are to Case Number 2:22-cv-00293 unless otherwise noted.

the Court finds that the Motion to Dismiss should be **DENIED-AS-MOOT** since it concerns the same counterclaim and defense on which summary judgment is urged.

## II.      BACKGROUND

In its operative complaint, Netlist asserts that Micron has infringed two patents, U.S. Patent Nos. 7,619,912 (the "'912 Patent") and 11,093,417 (the "'417 Patent").[2] (*See* Dkt. No. 100 at 2.) Micron counterclaims for violation of Section 1 of the Sherman Act[3] and asserts the affirmative equitable defense of patent misuse. (Dkt. No. 122 at 28–29, 39–40.)

Micron's antitrust counterclaim and patent misuse defense are both based on the Strategic Product Supply and License Agreement (the "Agreement") between Netlist and SK hynix Inc. ("SK hynix"). The Agreement, which settled litigation between Netlist and SK hynix over claims of patent infringement, ███████████████████████████████████████████████████████ ████████████████████. (Dkt. No. 344-2 at §§ 1, 7.2–7.3.) The Agreement also contains ██████████████████████████████. (*Id.* at §§ 2, 5.) However, even though the license ████████████████████████████████████████████████████████████. The Agreement ██████████████████████████████████████████████████████.[4] (*Id.* at §§ 1, 7.2– 7.3.)

---

[2] Netlist also asserted U.S. Patent Nos. 9,858,215 and 10,268,608 in the operative complaint but has since dropped them. (Dkt. No. 100 at 2; Dkt. No. 325 at 2.)

[3] 15 U.S.C. § 1.

[4] ██████████████████████████████████████████████████████████████ (Dkt. No. 344-2 at § 1.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The Agreement also contains a Most Favored Licensee ("MFL") clause,[5] the interpretation of which is central to Micron's allegations. The MFL clause provides in relevant part:



(*Id.* at § 7.12.) ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████.

Concerning the monetary consideration called for, the Agreement provides that SK hynix

████████████████████████. (*Id.* at § 8.1.) A previous license agreement between Samsung

---

[5] The MFL clause is commonly known as a most favored nation clause.

and Netlist provided that Samsung would pay $8,000,000.00. (Dkt. No. 427 at 9.) ███████████

██████████████████████████████████████████████████. (*See* Dkt. No. 427-2 at

59:21–60:5.) According to Micron, Netlist's most recent demand for a license was

███████████████. (Dkt. No. 472 at 9.)

### III.   LEGAL STANDARDS

#### A.  Summary Judgement

A motion for summary judgment is appropriate where "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The movant may introduce evidence affirmatively supporting its position and is entitled

to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."

*Epps v. NCNB Nat'l Bank*, 838 F. Supp. 296, 298–99 (N.D. Tex. 1993), *aff'd*, 7 F.3d 44 (5th Cir.

1993).  Alternatively, the movant can file what is known as a "no evidence" motion for summary

judgment, meeting its burden by establishing that "there is an absence of evidence to support the

non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In either context,

"[s]ummary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and

inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation

that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197

(5th Cir. 1986) (footnote omitted).

#### B.  Sherman Act Section 1

To establish a violation of Section 1 of the Sherman Act, Micron bears the burden to

demonstrate that: "(1) [Netlist and SK hynix] engaged in a conspiracy, (2) the conspiracy had the

effect of restraining trade, and (3) trade was restrained in the relevant market."  *Marucci Sports,*

*L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (citations omitted). If

Micron does **not** establish that an agreement is *per se* illegal, Micron must also demonstrate that (4) Netlist exercises market power in the relevant market; and (5) that it suffered an antitrust injury. *See PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (collecting cases); *Deslandes v. McDonald's United States, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) ("market power is not essential to antitrust claims involving naked agreements among competitors") (citing *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990)); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 976–77 (5th Cir. 1977) ("It is well established that tying arrangements are illegal *per se* …. 'The *per se* label indicates that a plaintiff need not demonstrate that the effects of the tie are unreasonable … but in addition the defendant is not free to demonstrate that the effects are reasonable or even affirmatively desirable.'") (quoting *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 374–75 (5th Cir. 1977)).

### C.  Patent Misuse

Patent misuse is the "patentee's act of impermissibly broadening the physical or temporal scope of the patent grant with anticompetitive effect." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (quotations and citation omitted). "The doctrine of patent misuse is thus grounded in the policy-based desire to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *Id.* (citations and quotations omitted).

### IV.   ANALYSIS

### A.  Sherman Act Section 1

To demonstrate a violation under Section 1 of the Sherman Act, Micron must produce "facts showing that the [alleged unlawful conspiracy] unreasonably restrained trade." *Marucci*, 751 F.3d at 375. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even

destroy competition." *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 351 n.12 (5th Cir. 1980) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). *See also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,* 846 F.2d 284, 289 (5th Cir.1988) (stating that only "*unreasonable* restraint[s]" are actionable under § 1 (citation omitted)).

By way of additional background, Micron relies on three aspects of the Agreement to allege that the Agreement ████████████████████████████████████ and ████████████████████████████████████████████████████████████████ ████████████████████████████████ (Dkt. No. 122 at 29.)

First, Micron relies on what it calls the "Scope Provision," which it argues requires ████ ████████████████████████████████████████████████████. (Dkt. No. 427 at 5.) Specifically, Micron relies on the last (and underlined) sentence of the following:



(Dkt. No. 344-2 at § 7.12 (emphasis supplied); Dkt. No. 427 at 5.)

Second, Micron relies on what it calls the "Information Exchange Provision," under which



.[6] (Dkt. No. 427 at 5.)

---

[6] There are (at least) two such passages. First:

████████████████████████████████████████████████████████████

Third, Micron relies on what it calls the "Royalty Base Provision," which, it argues, requires that ███████████████████████████████████████████████████ ███████████████████████████████████. Specifically, Micron relies on the following:



(*Id.*)

In the Motion Netlist argues that Micron has not produced any evidence that Netlist unreasonably restrained trade. (Dkt. No. 344 at 4–5.) The Agreement, Netlist contends, does not constitute price fixing or unreasonably restrain trade—it contains a standard most favored nation clause with two remedies. (*Id.* at 4 (citing *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("'Most favored nations' clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers."); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("'[A] policy of insisting

---

████████████████████████████████████████████████████

(Dkt. No. 344-2 at § 7.12.) Second:

████████████████████████████████████████████████████

(Dkt. No. 344-2 at § 7.12.)

on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary.'")).)

Regarding the Royalty Base Provision, Netlist argues that nothing in the Agreement requires royalties be '██████████████████████████████████████████

███████.'" (*Id.* at 6 (citing Dkt. No. 122 at 35.) Instead, Netlist urges, the Agreement simply provides that this is one of the factors the auditor should consider when determining whether a ██████████████████████████████████████████████████. (*Id.* (citing Dkt. No. 344-2 at § 7.12(a)).)  Next, Netlist contends that the Scope Provision does not prevent Netlist from granting licenses with ██████████████████████████████████████████. (*Id.*)

Netlist contends that the plain text contradicts Micron's interpretation and so its antitrust claim fails as a matter of law. (*Id.* at 6–7 (citing *First Nat'l Bank of Jackson v. Pursue Energy Corp.*, 799 F.2d 149, 151 (5th Cir. 1986) ("An unambiguous contract is interpreted as a matter of law."). Even assuming the Agreement is ambiguous, Netlist urges, Micron has failed to introduce any extrinsic evidence to support its interpretation. (*Id.* at 7.)

In response, Micron argues that under the applicable law, California state law, "when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight." (Dkt. No. 427 at 8 (quoting *Brown v. Goldstein*, 34 Cal. App. 5th 418, 437 (Ct. App. 2019) (quoting *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal. 2d 751, 761 (Cal. 1942))).)

Micron then argues that the combined effect of the Scope Provision, the Information Exchange Provision and the Royalty Base Provision is to "raise rivals' costs and hurt competition." (*Id.* at 8–9.) '███████████████████████████████████████████

8

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████." (*Id.*

at 9.) Micron argues that "anticompetitive effect is demonstrated by the fact that the asking price

for a license to Netlist's patents has gone from $8 million in the Samsung license, ███████████

█████████████████████████████████████████████████████████████" (*Id.*) Based on this,

Micron asserts that "[t]hese facts are sufficient to support a Sherman Act claim." (*Id.* at 9–10.)

Micron also contends that the Royalty Base Provision, standing alone, is unlawful because

it "encompasses products that do not infringe on any Netlist asserted patents." (*Id.* at 10 (citing

*McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 405 (10th Cir. 1965).) Micron then

argues that there is no law to support Netlist's implicit assertion that the MFL clause is *per se* legal

because it is standard. (*Id.*)

Finally, Micron argues that Agreement is ambiguous and its interpretations are supported

by extrinsic evidence: █████████████████████████████████████████████████████

████████████████████████████████████████████████████. (*Id.* at 10–

11.)

In reply, Netlist first argues that "Micron's opposition fails to identify any 'facts showing

that' the [Agreement] 'unreasonably restrained trade.'" (Dkt. No. 531 at 1 (quoting *Marucci*, 751

F.3d at 375).) Netlist then argues that Micron's interpretation renders sections █████████████

meaningless because, if the MFL clause sets a minimum price for subsequent licenses, SK hynix's

adjustment rights could never be triggered because Netlist can only offer higher prices. (*Id.*) Netlist

contends that this violates the canon of contract construction requiring that meaning be given to

every part of a contract. (*Id.* (citing *Miscione v. Barton Dev. Co.*, 52 Cal. App. 4th 1320, 1330

(1997)).) Netlist also re-argues its contract interpretation positions. (*Id.* at 1–3.)

Next, Netlist argues that the extrinsic evidence does not support Micron's interpretation. (*Id.* at 3.) Netlist contends that its licensing offers are rational business behaviors, and that portfolio licenses are standard because of their efficiency gains. (*Id.*) Netlist also argues that the increased prices do not support an inference of antitrust violation because "rising prices are equally consistent with growing product demand." (*Id.* at 3–4 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)).)[7]

In sur-reply, Micron notes that "Netlist's CEO declined to interpret the key contractual provision." (Dkt. No. 560 at 1.) Micron then argues that "even if it is technically *possible* for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, what matters is that the MFN poses such a 'severe financial penalty' on any subsequent lower-priced license that it effectively eliminates pricing competition." (*Id.* (quoting *U.S. v. Apple Inc.*, 952 F. Supp. 2d 638, 648, 694 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015)).) Otherwise, Micron largely repeats the same arguments made in its response. (*Id.* at 1–3.)

The Court finds that Micron's interpretation is unsupported by the Agreement's plain and unambiguous meaning such that the Agreement cannot constitute an unreasonable restraint of trade

---

[7] Netlist then continues its argument with the following:

> Regardless, the alleged ▮▮▮▮▮▮▮▮▮▮▮ that Netlist made to Micron is actually ***inconsistent*** with Micron's antitrust conspiracy theory. Again, the crux of Micron's Complaint is that the



(Dkt. No. 531 at 4 (emphasis in original).) This argument is nonsensical. Micron's argument is that the Agreement precludes Netlist from offering lower rates so offering higher rates would be consistent with Micron's interpretation of the Agreement, not inconsistent.

as a matter of law. *Marucci*, 751 F.3d at 375. Contrary to Micron's arguments, the language of the Agreement simply does not support Micron's interpretations and conclusions.

Micron's arguments follow two paths. The first path depends on the interpretation of the Agreement, the second path does not.

Turning to the first path, Micron contends that the Scope Provision, the Royalty Base Provision, and the Information Exchange Provision " ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ " (Dkt. No. 427 at 9.) Micron also argues that that the Royalty Base Provision itself is illegal. Micron relies on its specific interpretation of each provision for all of these arguments. As will be explained below, Micron's interpretations of the Scope Provision and the Royalty Base Provision are not supported by the text of the Agreement, and do not support Micron's resulting arguments. Additionally, the Information Exchange Provision does not fill the gaps in Micron's argument.

First, the Scope Provision ████████████████████████████████████████████ ████████████████. When read in light of the preceding sentence, it becomes clear that the Scope Provision (underlined below) is definitional and not proscriptive:



(Dkt. No. 344-2 at § 7.12 (emphasis supplied).)

The Scope Provision is simply definitional and no more for three reasons. First, the structure of the two sentences show that the second sentence is definitional. The term " █████████

██████████████" is provided as a defined term at the end of the first sentence. Next, the second

sentence states ████████████████████████████████████████████████

██████████", indicating that the second sentence continues to define the term. The idea that the

drafters would define a term which determines whether subsequent actions trigger certain remedies

(*i.e.* ████████████████████████████████████), and then proscribe a

party's conduct using language concerning what the term shall and shall not "include" is illogical.

Second, and relatedly, the use of the defined term "██████████████████" makes clear

that the drafters were intending to provide further definition of the defined term instead of limiting

Netlist's conduct.[8] Finally, the fact that the Agreement later instructs the Auditor to consider the

████████████████████████████████████████████████████

████████████████████████████████████. (Dkt. No. 344-2 at § 7.12.) If

read in isolation, the Scope Provision appears proscriptive. However, these three points defeat that

argument.

Second, the Royalty Base Provision ████████████████████████████████

████████████████████████████████████████████████████

██. The Royalty Base Provision provides:



(*Id.* at 7.12(a).) This simply requires that "██████████████████" be one factor in the comparison

of the Agreement to a Subsequent License Agreement. Indeed, this would be a particularly relevant

---

[8] The phrase "██████████████████," generally signals the parties' desire to provide further clarification and
definition. It does not typically take away or limit what comes before it. Micron makes no case for why the typical
usage and meaning are wrong here.

factor if Netlist granted a portfolio-wide license. Even if Netlist granted a license for a limited number of its patents, comparison of the " ███████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████ .

Since Micron's interpretation of the Royalty Base Provision fails, Micron's argument that the Royalty Base Provision itself is unlawful also fails. (*See* Dkt. No. 427 at 10.) Micron cites to *McCollough Tool* to argue that it is unlawful to "require[] that the royalty base for subsequent licensees extend to all methods related to the technology at issue, whether or not a licensed means." (*See id.* (citing *McCullough Tool*, 343 F.2d at 405).) However, as discussed above, the Royalty Base Provision ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ . The provision does not require that the ████████████████████████████████████████ ████████████████ . Accordingly, even under *McCollough Tool*, Micron's argument still fails.

Third, Micron does not argue that the Information Exchange Provision, acting alone, would " ███████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████ ." (Dkt. No. 427 at 9.) Since Micron's interpretations of the Scope Provision and the Royalty Base Provision are unavailing, these provisions do not support Micron's argument that the Agreement is anticompetitive. As a result, Micron must rely on the Information Exchange Provision for support; however, Micron, at most, argues that the " ███████████████████████████████████████████████ ██████████████████████████████████ ." (Dkt. No. 560 at 1.) Further, Micron cites no

evidence or authority why the Information Exchange Provision, whether by itself or in combination with any other portion of the Agreement, is an unreasonable restraint on trade.

Simply put, the Court finds that Scope Provision, the Royalty Base Provision, and the Information Exchange Provision do not unreasonably restrain trade, either alone or in combination with each other or any other part of the Agreement.

Turning to Micron's second path, Micron contends that the MFL clause itself ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Dkt. No. 560 at 1.) The Court finds that, as a matter of law, it does not. First, there is no naked price-fixing in the contract—under the MFL clause Netlist is allowed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See id.* at § 7.12.) Second, Micron has argued that the MFL clause "poses such a 'severe financial penalty' on any subsequent lower-priced license that it effectively eliminates pricing competition," but Micron has not supported this claim with any evidence. (Dkt. No. 560 at 1 (quoting *Apple*, 952 F. Supp. 2d at 648, 694).) Contrary to Micron's suggestion, nothing in *Apple* holds that all MFNs are *per se* illegal, or that they are *per se* illegal when they impose a "severe financial penalty." *See* 952 F. Supp. 2d at 691–94. The MFL clause neither fixes prices nor unreasonably restrains trade.

Accordingly, the Court finds that nothing in the Agreement constitutes an unreasonable restraint on trade. Summary judgment should therefore be granted in favor of Netlist on Micron's antitrust counterclaim. In light of this, the Court finds it unnecessary to reach Netlist's remaining arguments.

### B.  Patent Misuse

Micron does not dispute Netlist's contention that if Micron's antitrust counterclaim fails, so does its patent misuse defense. In Netlist's opening brief, it argues that "Micron's patent misuse defense is premised on the same theory as its antitrust counterclaim, *i.e.*, that the [] Agreement somehow requires Netlist to license its patents as package and at a specific minimum royalty rate."

As explained, above however, the Agreement does no such thing." (Dkt. No. 344 at 16.) In response, Micron argues that "the Agreement's provisions ███████████████████████ ███████████████████████████████. Micron has provided ample extrinsic evidence, including Netlist's licensing conduct, inability to offer individual patent licensing, and its own expert testimony to support Micron's interpretation. At a minimum, issues of fact preclude summary judgment." (Dkt. No. 427 at 20.) In Netlist's reply brief, it argues that "Micron does not dispute that its patent misuse defense is predicated on the same blatant misreading of the [Agreement] as its antitrust claim. Because that reading finds no support in the text of the agreement or the record evidence, Micron's patent misuse defense also fails." (Dkt. No. 531 at 10 (citation omitted).) In sur-reply, Micron argues that "Netlist's conduct supporting Micron's interpretation of the [] Agreement is given 'great weight' under California law, which governs the Agreement. At a minimum, genuine issues of material fact preclude summary judgment." (Dkt. No. 560 at 7 (citation omitted).) The parties are clear in their positions and Micron does not dispute that if its antitrust claims fails, so should its patent misuse defense.

Since summary judgment should is granted on Micron's antitrust claim, the Court finds summary judgment should also be granted on Micron's patent misuse defense.

### C. The Motion to Dismiss

In the Motion to Dismiss, Netlist requests that Micron's antitrust counterclaim and affirmative defense of patent misuse be dismissed and/or struck from Micron's answer, or, in the alternative, that the antitrust counterclaim be severed and stayed. (*See* Dkt. No. 154 at 1–2.) In light of the rulings herein, the relief requested in the Motion to Dismiss is moot.

### V.     CONCLUSION

For the foregoing reasons, the Court finds that the Motion should be and hereby is **GRANTED**. Additionally, as the Motion to Dismiss (Dkt. No. 154) concerns these same claims, the Court finds it should be and hereby is **DENIED-AS-MOOT**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 4th day of March, 2024.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE