# EXHIBIT 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   NETLIST, INC.,               (  CAUSE NO. 2:22-CV-203-JRG
                                  )
 4          Plaintiff,            (
                                  )
 5   vs.                          (
                                  )
 6   MICRON TECHNOLOGY, INC.,     (
     et al.,                      )  MARSHALL, TEXAS
 7                                (  MAY 20, 2024
            Defendants.           )  9:00 A.M.
 8   _____

 9
                             VOLUME 1
10
     _____
11
                         TRIAL ON THE MERITS
12

13
                BEFORE THE HONORABLE RODNEY GILSTRAP
14              UNITED STATES CHIEF DISTRICT JUDGE

15   _____

16

17

18

19

20

21

22

23              SHAWN McROBERTS, RMR, CRR
                  100 E. HOUSTON STREET
24              MARSHALL, TEXAS  75670
                     (903) 923-8546
25         shawn_mcroberts@txed.uscourts.gov
```

```
1                      A P P E A R A N C E S

2        FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                               LOS ANGELES
3                              1800 AVENUE OF THE STARS
                               SUITE 900
4                              LOS ANGELES, CA 90067-4276
                               (310) 203-7096
5                              BY:  MR. JASON SHEASBY
                                    MR. TONY ROWLES
6
                               IRELL & MANELLA -
7                              NEWPORT BEACH
                               840 NEWPORT CENTER DRIVE
8                              SUITE 400
                               NEWPORT BEACH, CA 92660
9                              (949) 760-0991
                               BY:  MS. REBECCA CARSON
10

11                             McKOOL SMITH, P.C. - MARSHALL
                               104 E. HOUSTON ST., SUITE 300
12                             MARSHALL, TEXAS  75670
                               (903) 923-9000
13                             BY: MS. JENNIFER TRUELOVE

14       FOR THE DEFENDANTS:   WINSTON & STRAWN, LLP -
                               REDWOOD CITY
15                             255 SHORELINE DRIVE, STE. 520
                               REDWOOD CITY, CA 94065
16                             (650) 858-6443
                               BY:  MR. MICHAEL RUECKHEIM
17
                               WINSTON & STRAWN, LLP - DALLAS
18                             2121 N. PEARL STREET, STE. 900
                               DALLAS, TEXAS  75201
19                             (214) 453-6500
                               BY:  MR. THOMAS MELSHEIMER
20                                  MR. REX MANN
                                    MS. NATALIE ARBAUGH
21
                               WINSTON & STRAWN, LLP - L.A.
22                             333 SOUTH GRAND AVENUE
                               38TH FLOOR
23                             LOS ANGELES, CA 90071-1543
                               (213) 615-1780
24                             BY:  MR. DAVID ENZMINGER

25
```

```
 1                                 WARD, SMITH & HILL, PLLC
                                   1507 BILL OWENS PARKWAY
 2                                 LONGVIEW, TEXAS  75604
                                   (903) 757-6400
 3                                 BY:  MR. WES HILL

 4          OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                   100 E. HOUSTON STREET
 5                                 MARSHALL, TEXAS  75670
                                   (903) 923-8546

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| SCOTT MILTON | |
| Direct By MR. SHEASBY ........................................... | 197 |
| Cross By MR. MELSHEIMER ......................................... | 235 |
| Redirect By MR. SHEASBY ......................................... | 267 |
| Recross By MR. MELSHEIMER ....................................... | 273 |
| NOEL WHITLEY | |
| Direct By MS. TRUELOVE .......................................... | 277 |
| Cross By MR. HILL ............................................... | 287 |
| Redirect By MS. TRUELOVE ........................................ | 306 |
| Recross By MR. HILL ............................................. | 308 |

1          The record will also show that that 2010 and 2011 time

2     when we in confidential JEDEC meetings told Micron and others

3     about our innovations was not the only time Micron accessed

4     our technology.  This is a 2015 presentation to Micron.  In

5     that presentation, we identify the '912 Patent to them.  In

6     that presentation, we identify the '417 Patent family to them.

7          And you can look at this document in your deliberations,

8     it's at PX 23, and I believe it will come in evidence and be

9     able to be accessible to you.  What Micron did with clear

10    notice of our patents is to sell products with the infringing

11    register logic circuit with the infringing data buffer

12    technology.

13         What's interesting about it is that after a meeting in

14    2015, they actually said, well, your IP in this area is very

15    impressive.  They're very complimentary of our intellectual

16    property.  But then they did something odd.  They didn't want

17    to keep a copy of our presentation.  They said, no thanks, we

18    don't need a copy of your presentation.

19         After many years of them using our technology, we gave

20    them one final opportunity.  We wrote to the CEO of their

21    company, Sanjay Mehrota, and we told him quite plainly that

22    you are infringing Netlist's intellectual property.  We listed

23    the critical patents that are at issue in this case, and

24    Micron, corporate representative, will testify under oath that

25    in no point in time did they ever investigate whether Micron

1    instructs its employees not to take the patents of others.

2         This is the timeline.  In 2011 were our presentations to

3    JEDEC.  In 2015 was our presentation to Micron.  Both times

4    they are aware of our patents.  In 2021 we sent them a letter

5    and then we waited a year hoping that they would do the right

6    thing.  They chose not to.  And now they must face the legal

7    consequences of their behavior.

8         You will have to decide the issue of infringement.  On

9    the issue of infringement, you will hear from Doctor

10   Mangione-Smith.

11        Doctor Mangione-Smith, I'd like him to stand now.  Doctor

12   Mangione-Smith is an independent expert.

13        Thank you, Doctor Mangione-Smith.

14        He was for many years a professor at UCLA, and what he

15   will do, he will split up the claims of our patents element by

16   element by element and he will show you that each element is

17   present in Micron's devices.

18        Now, he will do that by marshalling the secret and

19   official documents that Micron itself creates.  This is JX 9.

20   This is a Micron internal document, and you'll see, for

21   example, one of the elements refers to a command signal that

22   is transmitted to only one memory device.  And he will show

23   that in the official Micron documents, they admit that they

24   use each limitation of the claims, including this one.

25        Now, in this courtroom this week they will deny the exact

1    statements that are made in this document.  They will present

2    a witness who will ask you to believe that what they wrote

3    here was wrong, that what they wrote here was incorrect.

4        Again and again and again, their documents admit command

5    signals that are used to identify and control only one device

6    at a time.  This is another Micron document.  In court this

7    week, they will take the exact opposite position.

8        Their witnesses admitted under oath, we believe the facts

9    will show, they use this exact limitation, and this week in

10   this court they will claim the exact opposite.

11       For the '417 Patent, which is the other patent-at-issue

12   in this case, it's the same thing--they will dispute a

13   limitation.  For example, they will say, We do not have a

14   buffer chip that causes a delay.  Their own witnesses under

15   oath will testify to the exact opposite.

16       What Judge Gilstrap said is very important.  My argument

17   is not evidence.  The testimony of their own witnesses, the

18   documents that I have showed you, the secret internal

19   documents that I have shown you, are evidence.  And ask

20   yourself how much evidence you are actually seeing from our

21   opposing counsel.

22       Micron's arguments.  Micron will say, We didn't need

23   Netlist; Netlist technology is not technology that we wanted

24   or needed; we went in a different direction, despite the fact

25   that their largest competitor has acknowledged and embraced

1      the importance of our technology.

2          But the record will show that their own independent

3      expert will admit that he could not identify one Micron patent

4      that covers the products at issue in this case, he could not

5      identify one other third-party patent that covers the products

6      at issue in this case, and he did not investigate whether

7      Micron took Netlist's technology.

8          I will submit to you that there is a reason why he was

9      unable to identify any other patent that is used in these

10     products.  It's because the patents that are used in these

11     products are Netlist patents.  The patents that they accessed

12     through secret JEDEC meetings in 2011, the patents that they

13     are aware of in 2015, the patents they were given one final

14     time to license in 2021, and the patents that they chose to

15     use without permission.

16         Micron's next argument:  We are shocked that this lawsuit

17     was being brought.  2011, they were aware of our patents.

18     2015, we made a presentation to them.  April 2021, we gave

19     them a final notice of infringement.  They wrote us a letter

20     and said, We'll be in touch.  And a year later we were

21     required to file this suit because Micron chose not to comply

22     with the law.

23         The next issue you'll be asked to decide is damages.

24         And I'd like Mr. David Kennedy to stand.

25         We've asked Mr. Kennedy to analyze the damages that are

1    at issue in this case.  And the damages statute is very clear:

2    You pay for the use made of the invention by the infringer.

3        And I want to show you one particular piece of data that

4    Mr. Kennedy will speak to.  You may ask yourself, well, why

5    did Micron choose to infringe these patents?  And I will

6    submit to you that the record will show that once they

7    launched their infringing products, their market share

8    doubled.

9        THE COURT:  You have three minutes remaining.

10       MR. SHEASBY:  Chips on their own have no value.

11   Chips on memory modules with advanced logical technology that

12   can increase speed and increase density, the modules that are

13   infringing in this case, are what drove Micron to its

14   behavior.

15       The record will show that solely from the period of time

16   of our final notice letter, Micron has sold over $6.4 billion

17   in infringing products.

18       I want to be very clear.  Micron has been using this

19   technology for over a decade.  This technology is so durable

20   and so powerful, they have used it for over a decade, but we

21   are seeking damages only from the period of final notice.

22   Think about how many technologies are so powerful that they

23   last for a decade.  Think about an iPhone from a decade ago.

24   Think about a computer from a decade ago.  Think about a

25   television from a decade ago.  They have all transformed

1  you can't invent anything new.  But the only caveat to that is

2  that any of those patents that you generate from that original

3  specification, they're only valid for 20 years from the

4  original date, so in this case from 2005.

5  Q.   And what does this demonstrative depict?

6  A.   So what we're showing here as an example we're taking the

7  '274 Patent, which was that original grandparent patent, and

8  the '417 Patent, and showing just -- you know, this is just

9  one example, but it happens to be figure 9A where those

10  figures are identical.  But you'll see in the patents

11  themselves that all of the figures and the specification

12  portion are identical with all of those patents.

13  Q.   Did Netlist put the industry on notice of the importance

14  of the '417 Patent to the distributed buffer technology?

15  A.   Yes, we did.

16  Q.   What does this depict?

17  A.   So this is our HyperCloud data sheet.  We've seen it

18  before--PX 16.  And in there we list the '274 and the '574

19  Patents, which are the grandparent and parent of the '417.

20  Q.   Speaking now about the final notice that was given to

21  Micron, as part of your preparing for testimony did you

22  examine the records of correspondence between Netlist and

23  Micron?

24  A.   Yes, I did, sir.

25  Q.   What does PX 26 reflect?

1    A.    So PX 26 is a letter that we sent to Micron's CEO, and in

2    that letter we discuss the fact that we believe that the RDIMM

3    and LRDIMMs of Micron's were infringing our Netlist patents.

4    Q.    And what products are accused of infringement in this

5    case?

6    A.    It would be the RDIMM and the LRDIMM.

7    Q.    And what patents were identified for Micron?

8    A.    So in Exhibit A, which is part of PX 26, that letter we

9    sent, we identified the '912 along with the '274 and the '574,

10   which, again, are the parent -- grandparent and parent of the

11   '417.

12   Q.    Why wasn't the '417 Patent specifically listed?

13   A.    The '417 Patent had not yet been issued at that time.

14   Q.    Did Netlist provide information on pending patent

15   applications that may issue as well?

16   A.    Yes, we did.

17   Q.    What did Netlist say?

18   A.    So in this letter we talk specifically about the patents

19   that are included as well as any subsequently-issued patents

20   claiming priority to those patents, so in that same patent

21   family.

22   Q.    Did Micron respond to Netlist's letter?

23   A.    Yes, they did.

24   Q.    What does DX 2 reflect?

25   A.    So DX 2 is a response to the letter.

1    Q.   This was from May 20, 2021.

2         When was the lawsuit filed in this matter?

3    A.   I believe it was like over a year after that.

4    Q.   Based on your review of the correspondence, was there

5    ever a point in time where Micron wrote back as to these two

6    patents and said, We do it differently?

7    A.   Not to my knowledge.

8    Q.   You have some familiarity with JEDEC.  Is that correct,

9    sir?

10   A.   That is true.  That's true.

11   Q.   I want to first focus again on the products at issue in

12   this case.

13        What are the two patents that are -- two products that

14   are accused of infringement?

15   A.   So in this case we're talking about the DDR4 generation

16   RDIMM and DDR4 generation LRDIMM.

17   Q.   And the LRDIMM has the data buffers with timing

18   compensation?

19   A.   That is correct.

20   Q.   And what does the RDIMM have?

21   A.   The RDIMM has that register logic circuit with the

22   feature to address individual DRAM.

23   Q.   Does Netlist believe Micron was made aware of the

24   patented technology before these products were launched?

25   A.   Yes, we do.

1   Q.    What is JEDEC?

2   A.    So JEDEC is a standards organization where the major

3   industry manufacturers and customers can come together to talk

4   about their technology.

5   Q.    What type of issues are discussed at JEDEC?

6   A.    So primarily JEDEC is used to work on interoperability.

7   You know, it's very important for all the vendors and

8   customers to be able to use the same products so that when

9   you, you know, go to Fry's and buy a product, you can plug it

10   in and it will work.  So that doesn't happen by accident.

11   There is actually an organization that works with all of the

12   various companies to make sure that that happens.

13   Q.    Do companies also discuss their specific design plans at

14   JEDEC?

15   A.    Sometimes they do, yes.

16   Q.    And are JEDEC meetings confidential or public?

17   A.    They are confidential.

18   Q.    Does JEDEC give parties rights to patents that are

19   discussed at those meetings?

20   A.    They do not.

21   Q.    Did Netlist disclose to JEDEC the importance of the '912

22   Patent as '417 patented technology?

23   A.    Yes, we did.

24   Q.    What is PX 27?

25   A.    So PX 27 is the meeting notes from one of those JEDEC

```
 1    A.    Okay.

 2    Q.    If I added Texas, that would make what I'm describing

 3    narrower.  Right?

 4    A.    Okay.  Depending on what we're talking about.

 5    Q.    If I added Marshall, that would make it narrower,

 6    wouldn't it?

 7    A.    When you say 'make it narrower', I mean, you are talking

 8    more about a smaller part of the map.

 9    Q.    Right.  And if we said 105 Houston Street, East Houston

10    Street, that would be narrower still as an area that I'm

11    describing with different elements.  Can we agree on that?

12    A.    In that particular example, I agree.

13              MR. MELSHEIMER:  May I have a moment, Your Honor?

14              THE COURT:  You may.

15    Q.    (BY MR. MELSHEIMER)  Mr. Milton thank you for your

16    courtesies.

17              MR. MELSHEIMER:  No further questions, Your Honor.

18              THE COURT:  You pass the witness?

19              MR. MELSHEIMER:  Yes, Your Honor.

20              THE COURT:  Redirect?

21              MR. SHEASBY:  Yes, Your Honor.

22              THE COURT:  Are you going to use the chart during

23    redirect?

24              MR. SHEASBY:  I will not, Your Honor, but I will

25    move it back.
```

1          THE COURT:  We need to turn it to a clean sheet.

2          MR. SHEASBY:  Yes, Your Honor.

3          THE COURT:  All right.  Let's go forward with

4    redirect.

5                    REDIRECT EXAMINATION

6    BY MR. SHEASBY:

7    Q.   I want to start by talking about Micron's exposure to the

8    Netlist patents.

9          MR. SHEASBY:  If we could have slide 44.

10   Q.   (BY MR. SHEASBY)  In opening, counsel for Micron

11   suggested that Micron wasn't aware of the Netlist inventions

12   until 2015.

13        When did Netlist disclose the inventions to Micron?

14   A.   So if we look at PX 27, we see that in September of 2010

15   that we called out to JEDEC the '274 and the '912 Patents.

16   Q.   Was Mr. Melsheimer being accurate or inaccurate when he

17   represented that Micron didn't know about these patents until

18   2015?

19   A.   That would be incorrect.

20        MR. SHEASBY:  Can I have the elmo?

21   Q.   (BY MR. SHEASBY)  This is a letter that was written back

22   in June of 2021, which is a few months after Netlist gave

23   final notice.  Correct?

24   A.   That's correct.

25   Q.   Is there any portion of this letter that disputes

1    infringement of the patents-in-suit in this case?

2        And I'll turn the other side so you can see the other

3    side.

4    A.   I don't see anything that disputes infringement.

5    Q.   In your records, did you see any evidence in which Micron

6    said, quote, We don't agree we infringe?

7    A.   I have not seen that.

8    Q.   What Micron says in this letter is they ask you about

9    proposed licensing rates.  Do you see that?

10   A.   I do see that, sir.

11   Q.   When does a company request licensing rates for patents?

12   A.   When they believe they need to take a license because

13   they are infringing the product.

14   Q.   Micron showed you a 2018 document from Rahul Advani at

15   Netlist.  Is Rahul Advani at Netlist involved in patent

16   licensing, or was he involved in patent licensing?

17   A.   He was not, sir.

18   Q.   He describes Vinod Lakhani, who is the business VP for

19   emerging memories as, quote, Not a friend of Netlist.

20       Does the subject of this email have anything to do with

21   RDIMM or LRDIMM?

22   A.   I don't believe so, sir.

23            MR. SHEASBY:  Let's go to slide 61.

24            THE WITNESS:  Oh, wait.  I'm sorry.  Can we go back?

25   Q.   (BY MR. SHEASBY)  Yes.

1    A.    Okay.

2    Q.    HDIMM, NVDIMM-P.

3    A.    And the other side?

4              MR. MELSHEIMER:  Your Honor, just object to the

5    leading.

6              MR. SHEASBY:  I apologize.

7              THE COURT:  Let's avoid leading.  This is redirect.

8              THE WITNESS:  Okay.  Yeah.  I'm sorry, sir.  Could

9    you ask your question one more time?

10   Q.    (BY MR. SHEASBY)  Does this exchange have anything to do

11   with the use of LRDIMM or RDIMM technology?

12   A.    Okay.  Yeah.  I spoke too quickly before.  So the

13   HybriDIMM does have LRDIMM technology in it, and NVDIMM-P is

14   a -- is kind of the JEDEC version of what we were calling our

15   HybriDIMM product.

16   Q.    And he describes it as he understands the value.

17   Correct?

18   A.    That's correct.

19   Q.    In 2018 did you find any records in which Micron disputed

20   or said it wasn't infringing the patents it had access to in

21   2011?

22   A.    Did I find any documents that said they weren't

23   infringing?

24   Q.    Yes, sir; where they disputed infringement.

25   A.    I have not seen those documents.

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          05/20/2024

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12          .

13

14

15

16

17

18

19

20

21

22

23

24

25